THE STATE OF DELAWARE, upon the relation of James R. Morford, Attorney-General, v. RALPH W. EMERSON.

(*August* 9, 1939.)

RODNEY and SPEAKMAN, J. J., sitting.

*Stewart Lynch* for Relator.

*P. Warren Green* and *Henry M. Canby* for defendant.

Superior Court for New Castle County, *Quo Warranto,* No. 147, May Term, 1939.

RODNEY, J., delivering the opinion of the Court:

In the consideration of this case the questions will be considered in the order as suggested in the statement of facts because it seems logical to consider in their proper order (1) the power of the Legislature to take the action which has been objected to, viz.: the naming in the Act of Assembly of the additional members of the State High-

way Department; (2) whether, in said action, the Legislature has used an apt and constitutional title for the Act of Assembly, and (3) whether the Act of Assembly received the number of votes required by the *Constitution*.

The answers to these questions and consideration of all pertinent authorities might well extend this discussion indefinitely. We shall content ourselves with such presentation as will clearly express the views we hold and yet keep this opinion within reasonable limits.

Much space has been devoted to the discussion of the philosophy of government involved in the division into three cardinal branches, the Legislative, the Executive, and the Judicial. With this philosophy we are in entire accord. The acceptance of the doctrine, however, is primarily a matter of constitutional regulation. When the people of a State meet in convention to form a Constitution it is for them to say in what manner the powers of government shall be divided. It is then that the division of powers should be weighed and decided. There are no inherent rights appertaining to any branch of government which may not be altered by the *Constitution*. Thus no power would seem more inherent in the legislative branch than the power to enact legislation. Three *Constitutions of Delaware* (1776, 1792 and 1831) gave this power, unhampered, to the legislative branch, but the fourth (1897) provided for submission of every Act to the Governor, and established the right to veto, thus giving to the executive a large share of the power theretofore purely legislative. So it is in the power of appointments. There is no inherent right in the Executive to make appointments which the *Constitution* may not alter or remove entirely, and these periodic changes have been evidenced by the *Constitution* of every state. Let us, therefore, but briefly trace the provisions concerning appointments to office through the various *Constitutions* of this State.

The first *Constitution of* 1776 was framed pursuant to a resolution of the Continental Congress to remedy the chaotic conditions caused by the *Declaration of Independence* from Great Britain and the natural severence of all former governmental ties. In this first *Constitution* little heed was paid to the philosophy of division of government into the three branches now so widely recognized. By it the Governor (then called President of the State) was elected by the Legislature, and the President and Legislature together selected the judiciary. In the solution of the present question but little help may be gathered from the *Constitution* of 1776.

The second *Constitution of* 1792 came into being after the *Federal Constitution of* 1787 and formed a model utilized by sister states. By these the philosophy of divisions of powers had reached its full fruition and "checks and balances" had become a trite expression of such desirable division. The *Constitution of* 1792 gave plenary legislative power to the General Assembly, and the approval of the Governor was not required as to legislation, and there was no veto power. It gave to the Governor full and uncontrolled power of appointments in the following language of *Art.* III, Sec. 8: "He shall appoint all officers whose offices are established by this constitution, or shall be established by law, and whose appointments are not herein otherwise provided for."

It will thus be seen that except where the manner of appointment was provided by the *Constitution* of 1792, the Governor was given the power of appointment of offices created or recognized by the *Constitution* as well as those which might thereafter be created by law. An example falling within the exception is furnished by *Sec.* 3 of *Article 8*, whereby the State Treasurer, a constitutional officer, was elected by the House of Representatives, with the concurrence of the Senate. Other examples showing a limitation on

the appointing power of the Governor and providing for statutory appointments, are found in *Sec. 6, Article VIII,* which provided: "Attorneys at law, all inferior officers of the treasury department, election officers, officers relating to taxes, to the poor, and to highways, constables and hundred officers, shall be appointed in such manner as is or shall be directed by law."

The *Constitution* of 1831 retained in substantial entirety the appointing power of the Governor as theretofore existing, and we may thus pass directly to the provisions of the present *Constitution* of 1897.

The *Constitution* of 1897 made certain important and far reaching changes. Not only did it limit, as we have indicated, the exclusive power of the General Assembly over legislation by giving to the Executive a measure of supervision and approval, together with the veto power, but it entirely changed and rewrote the provisions as to appointments to office. The power of appointments by the Governor was thus expressed: "He [the Governor] shall have power, unless herein otherwise provided, to appoint, by and with the consent of a majority of all the members elected to the Senate, such officers as he is or may be authorized by this *Constitution* or by law to appoint." *Section 9, Art. 3.*

This new *Constitution* made a number of changes. It made elective many offices theretofore filled by appointment by the Governor; it circumscribed the Governor's absolute power of appointment by the requirement, in many cases, that the appointment be made with the consent of the majority of the Senate; it expressly stated that he have power to appoint "such officers as he is or may be authorized by this *Constitution* or by law to appoint."

The Relator contends that the *Constitution* of 1897, while removing from the Governor the power to appoint to offices that were made elective, yet left with the Execu-

tive the general power of appointment for offices which were still to be appointed. For this no direct authority is cited, but we are referred to the debates of the Constitutional Convention. An exhaustive consideration of these debates does not lead us to a conclusion contrary to the terms of the *Constitution* or convince us that the members of the Convention intended a result contrary to that expressed by *Article* 3, *Sec.* 9. The precise question was not involved in *State v. Churchman, in* 3 *Penn.* 361, at *page* 369, 51 *A.* 49, *at page* 61, but the discussion there at least showed the judicial thought upon the question. In the cited case Judge Spruance (who had been a leading member of the Constitutional Convention), dissenting from the majority on other grounds, said that the new *Constitution* not merely imposed upon the Governor's appointing power the necessity of confirmation by the Senate, but also diminished the number of offices to which he might appoint. He said: "By the old constitution he had power to appoint to all offices established by the constitution or by law, where the constitution did not otherwise provide, but under the new constitution his power of appointment is limited to such offices as he is or may be authorized by the constitution or by law to appoint."

Since the *Constitution* expressly removed elective offices from the field of the Governor's right to appoint and placed these elective offices within the prohibition "unless herein otherwise provided", and since the Relator contends the only change in the Governor's right to appoint was the withdrawal of "elective offices," it would seem that the Relator must contend that, except as to elective offices, no change whatever was made by the widely divergent language of *Art.* 3, *Sec.* 9.

If the *Constitution* had only intended to change the appointing power of the Governor as to elective offices thus

removed from his authority, nothing would have been easier than to use language to indicate such intention.

The very power given to the Governor to fill vacancies is expressive of his general power. He is given power to fill vacancies in elective offices by granting commissions to expire when their successors shall be duly qualified. He is also given power to fill vacancies during the recess of the Senate "in offices to which he may appoint", by granting commissions to expire at the next session of the Senate. If he had the general power to appoint in all but elective offices, the words "in offices to which he may appoint" are entirely unnecessary and have no meaning whatever. If, on the other hand, the power of the Governor to appoint to office is limited to those cases where it is given either by the *Constitution* or by some law, then the words as to filling vacancies have a definite and necessary meaning and of course every word must be considered and construed, when possible, so as to have reason for their insertion.

The Constitutional provisions for the Governor to make appointments is a grant of power. It is not a limitation on the power to the Governor, which power would be unlimited except for the provision. Being a grant of power, and to that extent a limitation on the people acting through their representatives, let us see in what cases the Governor is expressly authorized to appoint to office. With the consent of the Senate the Governor is expressly given power to appoint "such officers as he is or may be authorized by this *Constitution* or by law to appoint."

The right of the Governor to appoint to Constitutional offices is the exact measure of his authority to appoint to statutory offices-viz.: "as he is or may be authorized * * * to appoint." If, as to Constitutional offices, the right of the Governor to make appointments exists by reason of Constitutional authority to appoint and not by reason of any inherent power existing in the Executive, so it is as to statu-

tory offices—for the language is precisely the same. For the power to exist we must seek and find some authority—constitutional or statutory. If there exists no express or implied constitutional or statutory authority to appoint, then no right to appoint exists. Many of the questions here involved were discussed in *State ex rel. Green v. Collison,* 9 *W. W. Harr.* (39 *Del.*) 245, 197 *A.* 836, and *Collison v. State,* 9 *W. W. Harr.* (39 *Del.*) 460, 2 *A.* 2d 97, 119 *A. L. R.* 1422. It is unnecessary to here repeat that discussion.

We see nothing in the *Constitution* which prevents the Legislature from creating a statutory Commission or Board and naming the members thereof. If that were true, then we see no reason why an existing statutory Board may not be amended by increasing the membership, such new members being designated in the Amendatory Act.

2. Has the Legislature in the Act in question used a constitutional title?

*Art.* 2, *Sec.* 16 of the *Delaware Constitution* provides: "No bill * * * shall embrace more than one subject, which shall be expressed in its title."

The construction of similar constitutional provisions can be found in a myriad of cases, including many in our own jurisdiction. The purpose and intent of the provision has often been stated to be to prevent hodge-podge or log rolling legislation; to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the title gave no intimation; to fairly apprise the people through the publication of legislative proceedings, that they may have the opportunity of being heard by petition or otherwise. These are but some of the many reasons advanced for the existence of the provision. *In re Cypress Farms Ditch,* 7 *W. W. Harr.* (37 *Del.*) 71, 180 *A.* 536; *Equitable Guarantee & Trust Co. v. Donahoe,* 3 *Penn.* 191, 49 *A.* 372; *Discount & Credit Corp. v. Ehrlich,* 7 *W. W. Harr.*

(37 *Del.*) 561, 187 *A.* 591; *Baxter v. State,* 9 *W. W. Harr.* (39 *Del.*) 223, 197 *A.* 678.

At the very inception we may distinguish between the requirements of the title of an original act and those required in an Act amendatory of an existing Act. The distinction is clear and it has often been *held* that the title of an Amendatory Act need not be drawn with the same particularity of an original Act and we may eliminate from our consideration all cases relating to original Acts. We may also concede, for the purpose of the discussion, that an Amendatory Act may, by its title refer generally to the Act it amends, leaving those interested charged with the duty of ascertaining in what particulars or to what extent the Amendment becomes operative. *Baxter v. State,* 9 *W. W. Harr.* (39 *Del.*) 223, 197 *A.* 678.

We thus come to the direct question—Is it permissible for the title of an Amendatory Act to refer to the Act to be amended and to set out specifically the particular nature of the Amendment proposed, and then have the body of the Amendatory Act cover matters foreign to the purpose of amendment as expressed in its title?

The Act in question is entitled *"An Act to Amend Chapter 166 of the Revised Code of Delaware 1935,* providing for the reorganization of the State Highway Department by increasing the membership thereof."

As we have previously indicated we may assume for this discussion, that the title would have been sufficient if it had stopped with the word "Department", so as to read *"An Act to Amend Chapter 166 of Revised Code of Delaware 1935* providing for the reorganization of the State Highway Department". Such a title would have put every person, legislator and citizen, upon notice that the Department was being reorganized generally and each person would be placed upon notice to inform himself, if interested,

of the particulars of the reorganization. Instead of this course the title of the Act has informed the public that the original Act is to be amended in one particular and in one particular alone, viz.: "by increasing the membership thereof."

The Relator contends that the title is misleading and insufficient because while the title indicates that the original Act is to be amended in the sole particular of "increasing the membership thereof", yet the Relator contends that the body of the Act contains at least six subjects disconnected with and foreign to the title. While the numerical order is somewhat altered by us, these subjects are here given and will be separately considered.

1. The Act specifically appoints by name, three new members of the Highway Department.

2. Concurrence of four members of the Highway Department is needed to hire a Chief Engineer and a Secretary, whereas under the statute before amendment, concurrence of three members was sufficient.

3. Concurrence of five members of the State Highway Department is needed to purchase materials and employ labor without competitive bids, in case of emergency, whereas before amendment, the Concurrence of only three members of the Department was needed for this purpose.

4. The new law provides that the Secretary of the Board "shall hold office at the pleasure of the Department." The former law provided no such limitation.

5. The Governor is eliminated as a member of the State Highway Department.

6. The terms of office of the various members are altered.

Now in considering the objections made by the Relator it is necessary to keep in mind the clear principle that the title of an Act is not required to be an index or table of contents of the Act itself, and many things may be included in the body of an Act which are, in themselves, matters of detail concerning the subject as expressed in the title.

1. The Relator contends that the title is defective because the title merely provided for the increase in membership, while the body of the Act specifically appointed the new members. We see nothing objectionable in this. We have heretofore *held* that the Legislature had power to make the appointments. It is not required that the title indicate by whom the appointments were to be made.

2 & 3. These objections may be grouped together. They both relate to the increase of numerical vote rquired in hiring an engineer and a secretary and in performing other functions of the Department. They both relate, we think, to matters of detail in the management of the Department, made necessary by the provisions for increased membership.

4. This objection has its basis on the fact that the new law provided that the Secretary "shall hold office at the pleasure of the Department." We doubt if the new provision is any amendment at all, or whether it introduces any new thought. It is more than possible that it simply expresses what theretofore had been left to implication.

The two remaining objections are much more serious and require more explicit and detailed consideration.

5. The Relator contends that a title indicating a reorganization of the Highway Department by "increasing its membership" is clearly insufficient when the body of the Act in fact first decreases the membership by the elimination of a member. The Governor of the State had been

a member of the Department. The new Act eliminates the Governor as a member. There was nothing in the title of the Act "increasing the membership" that could give the slightest indication of the intent to bring about the elimination of sitting members, and this is no matter of detail. The question can be tested by a plain example. Suppose the Amendatory Act had by its title provided, as it did, for the reorganization of the Highway Department merely by "increasing its membership" and suppose the body of the Act had legislated out of office the entire membership of the five members of the Department and named seven new members in their stead. Could it be contended that the Act merely "increased the membership," or would there have been in the body of the Act a separate, distinct and independent matter, no suggestion of which was expressed in the title? That precise question came before the Supreme Court of South Dakota, in *Toohey v. Burnside*, 40 *S. D.* 579, 168 *N. W.* 742. There under the facts just stated and pursuant to a constitutional provision similar to our own, the Court *held* the Amendatory Act unconstitutional and invalid. The question here presented involves precisely the same principle, differing only in degree. We think the language of the title "by increasing the membership" connotes an augmentation of numbers but holds no suggestion of elimination of existing members, which is an entirely separable subject, not expressed in the title. For this reason we think the Amendatory Act unconstitutional.

6. The Relator contends that the body of the Amendatory Act changed the terms of office of members of the State Highway Department and that this change was in no way connected with "increase of membership" as expressed in the title of the Amendatory Act. In the original Act the Department consisted of the Governor and four members resident, respectively, in Wilmington, New Castle County (outside of Wilmington), Kent County and Sussex County.

These four members each held office for eight years expiring, respectively, in the years 1939, 1941, 1943 and 1945. The Amendatory Act, under a title of merely "increasing the membership" by an intricate arrangement of tenures changed the terms of all future members of the Department, so that eventually six members would hold office for six year terms and one for a four year term. No suggestion of these changes is expressed in the title and it is impossible to consider them as essential "details" made necessary by "increase of membership."

Many cases have determined the principle which we have just discussed, viz.: that where the title of an Amendatory Act recites the title of the Act to be amended, and also specifies the amendments to be made, the legislation is limited to the amendments specified and anything outside of these is void. The current of authority is uniform and no authority holds otherwise. Space does not permit an elaborate discussion of the cases. They include *Hays v. Federal Chemical Co.*, 151 *Tenn.* 169, 268 *S. W.* 883; *Niles v. Steere*, 102 *Mich.* 328, 60 *N. W.* 771; *Davey v. Ruffell*, 162 *Pa.* 443, 29 *A.* 894; *Abernathy v. Mitchell*, 113 *Ga.* 127, 38 *S. E.* 303; *State v. American Sugar Ref. Co.*, 106 *La.* 553, 31 *So.* 181; *Com. v. Samuels*, 163 *Pa.* 283, 29 *A.* 909; *Com. v. Severn*, 164 *Pa.* 462, 30 *A.* 395; *Ward Cattle & Pasture Co. v. Carpenter*, (*Tex. Civ. App.*) 168 *S. W.* 408; *Rutledge v. Atkinson*, (*Tex. Civ. App.*) 101 *S. W.* 2d 376; *State v. Schultz etc. Co.*, 83 *Md.* 58, 34 *A.* 243; *People v. Howe*, 177 *N. Y.* 499, 69 *N. E.* 1114, 66 *L. R. A.* 664; *State ex rel. Landis v. Ault*, 129 *Fla.* 686, 176 *So.* 789; *Moore v. Moore*, 23 *Pa. Super.* 73.

See also *Lewis' Sutherland Stat. Const.*, 2d *Ed.*, *Sec.* 140; 59 *C. J.* "Statutes," *Sec.* 400; 1 *Cooley Const. Law*, 8th *Ed.*, 310.

We are entirely familiar with the principle

that every Act of Assembly should be held constitutional if there be any reasonable basis sustaining the Act. This has been the uniform holding of our Courts with which we are in full accord. In a Constitutional Government, however, the *Constitution* is binding on the Legislative as well as other branches of Government. The *Constitution* provides that "no bill * * * shall embrace more than one subject, which shall be expressed in its title." When an Act does contain subjects not expressed in the title and of which there is no intimation in the title, and which subjects are of independent and separate nature and not mere details connected with the subject matter of the title, then it is the duty of the Court to pronounce the Act unconstitutional. The *Constitution* is the fundamental law. Where its provision is plain there is brought into play the familiar maxim *"Ita lex scripta est"*—thus the law is written.

3. The Relator contends, also, that the Act in question did not receive the number of votes required by the *Constitution*. In view of our conclusion that the Amendatory Act is unconstitutional and therefore void it is, of course, unnecessary to consider the number of votes that such Act received. If the Act is void it is quite immaterial whether it received less than the Constitutional requirement, whether it was passed unanimously or received any number of votes between the two. Discussion of such question would seem to be purely obiter.

Believing that the Senate substitute for *Senate Bill No.* 224 was not constitutional for the reasons herein expressed, and in accordance with the agreed statement of facts, judgment of ouster must be entered in favor of the Relator and against Ralph W. Emerson, the defendant.

Similar orders must be entered in the companion cases hereinbefore mentioned and referred to.